1                 IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF NEW MEXICO

 3
     UNITED STATES OF AMERICA,      )
 4                                  )
                     Plaintiff,     )
 5                                  )
                     vs.            )  NO: 22-CR-1561 MIS
 6                                  )
     MICHAEL RIVERA,                )
 7                                  )
                     Defendant.     )
 8

 9

10              PARTIAL TRANSCRIPT OF PROCEEDINGS
                           JURY TRIAL
11       (*Trial testimony of Daniel E. O'Donnell, Part 1 of 2*)
              BEFORE THE HONORABLE MARGARET I. STRICKLAND
12                 UNITED STATES DISTRICT JUDGE
                     THURSDAY, JULY 6, 2023
13           LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21        (Proceedings recorded by machine shorthand and
      transcript produced by Computer-Aided Transcription.)
22
      REPORTED BY:    VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmd.uscourts.gov

```
 1
 2    Appearances of Counsel:
 3
 4        FOR THE UNITED STATES:
 5
 6                    UNITED STATES ATTORNEY'S OFFICE
                      District of New Mexico
                      100 N. Church St.
 7                    Las Cruces, NM  88001
                      BY:  MARISA ONG, ESQ.
 8                         R. ELIOT NEAL, ESQ.
 9        FOR THE DEFENDANT:
10                    LAW OFFICES OF BROCK BENJAMIN
                      609 Myrtle Ave., Ste. B
11                    El Paso, TX 79901
                      BY:  BROCK BENJAMIN, ESQ.
12
             and
13
                      SHAHARAZAD MCDOWELL BOOTH, LLC
14                    P.O. Box 13856
                      Las Cruces, NM 88013
15                    BY:  SHAHARAZAD BOOTH, ESQ.
16
17
      Also Present:  Ashley Rousse, Staff, U.S. Attorney's Office
18                   Monica Benjamin, Staff, Benjamin Law Office
19
20
21
22
23
24
25
```

```
 1                          I N D E X

 2   WITNESSES FOR THE GOVERNMENT:                        PAGE

 3   DANIEL E. O'DONNELL

 4        Direct Examination by Ms. Ong                     4

 5

 6                        E X H I B I T S

 7   EXHIBITS FOR THE GOVERNMENT:         IDENTIFIED   RECEIVED

 8      30 Grooming stages graph              20          19
        31 Grooming graph                     21          19
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                         * * * * * * *

2                    (Begin partial transcript.)

3           MS. ONG:  The United States calls Special Agent

4    Daniel O'Donnell.

5           THE COURT:  All right.  Special Agent O'Donnell,

6    come forward and I'll swear you in.

7                     **DANIEL E. O'DONNELL**,

8           After having been first duly sworn, did make the

9    following answers:

10                     **DIRECT EXAMINATION**

11          THE COURT:  Thank you.

12   Q.  (BY MS. ONG):  Good afternoon.

13   A.  Good afternoon.

14   Q.  Can you please state and spell your name for the

15   record.

16   A.  So Daniel E. O'Donnell.  First name D-A-N-I-E-L.

17   Middle initial "E."  Last name "O," apostrophe,

18   D-O-N-N-E-L-L.

19   Q.  What is your current occupation?

20   A.  I am a Supervisory Special Agent with the Federal

21   Bureau of Investigation.

22   Q.  What type of things do you do in that role?

23   A.  In my current capacity, I'm also the Unit Chief for

24   the FBI Behavioral Analysis Unit III, or BAU III, which is

25   our Crimes Against Children unit located back in Virginia.

1    Q.    And the Behavioral Analysis Unit, is that a component

2    of the FBI?

3    A.    Yes, ma'am.

4    Q.    And I think you kind of touched on this, but just to

5    be clear, what is Unit III?

6    A.    So we have four operational units within the BAUs

7    within the FBI that specialize in different criminal

8    violations, and we simply divide them up by number

9    designation.  It's not very creative.  So, in my case, it's

10   BAU III, which is exclusively focused on crimes against

11   children matters.

12   Q.    And when you say "crimes against children," can you

13   tell us what types of crimes we're talking about?

14   A.    Yes, ma'am.  Most often, the crimes that we're

15   involved with involve child sexual abuse, online child

16   sexual exploitation and other types of abuse of children;

17   child abductions, typically, that are sexually motivated,

18   child homicides, and a variety of other crimes that are

19   perpetrated against children.

20   Q.    What's the primary goal or purpose of your unit?

21   A.    So our primary purposes are to provide behaviorally

22   based operational support to our federal, state, local, or

23   tribal law enforcement around the country.  Again, in my

24   case, that refers to crimes against children.  And we have

25   three -- what are three primary goals within all of the

1    different units:  The first is to provide that investigative

2    support in the form of recommendations, strategies.  And

3    that usually occurs through what we refer to as

4    "consultations."  So we may do that in person where we meet

5    with the agency, we may do it over the phone, or we may

6    deploy out during active and/or cold cases and embed

7    ourselves within that department and within that command

8    post.

9              Our other two primary responsibilities are to

10   conduct and be familiar with research in our specific

11   areas -- again, in my case, that refers to crimes against

12   children -- and then also to conduct training around the

13   country, typically to law enforcement officers.

14   Q.   Special Agent O'Donnell, do you have any knowledge of

15   the facts of our case here today?

16   A.   No, ma'am.  The only information I have is the

17   location where it's at and the disclosure notice that I

18   signed prior to coming out.

19   Q.   Have you met any of the witnesses in this case?

20   A.   No, ma'am.  Other than the law enforcement, I believe

21   maybe the case agent, that was it.

22   Q.   Have you read any reports?

23   A.   Again, other than the -- my own disclosure notice, no,

24   ma'am.

25   Q.   And why is that?

1    A.    My understanding is I was asked to testify to help

2    educate members of the jury as to general clusters of

3    behaviors that are commonly used by child offenders to

4    sexually exploit children and not necessarily to comment on

5    any particular case or fact.

6    Q.    And so what you're doing here, has that sometimes been

7    referred to as being a "blind expert"?

8    A.    Yes, ma'am.

9    Q.    And what's the value in that?

10   A.    From my perspective, again, it's testifying as to my

11   general experience related to these types of offenders and

12   the different types of clusters of behaviors that we often

13   see, again, as opposed to make any sort of comment on a

14   particular case.

15   Q.    All right.  And so you referenced your prior

16   experience.  I'd like to talk to you a little bit about your

17   education, training, and experience.

18   A.    Yes, ma'am.

19   Q.    Let's start with your education.  Can you please tell

20   the ladies and gentlemen of the jury about any education you

21   have, post-high school?

22   A.    I have a bachelor's degree in business administration,

23   a bachelor's degree in psychology, and a master's degree in

24   accounting.

25   Q.    What about your professional experience after college?

1    A.   I worked for two accounting firms for several years

2    before joining the FBI.

3    Q.   And when did you first join the FBI?

4    A.   That was a little over 19 years ago, in 2004.

5    Q.   How long have you been with the Behavioral Analysis

6    Unit?

7    A.   Approximately -- I was first promoted back in 2016,

8    so approximately seven and a half years.

9    Q.   All right.  And before you started your work at the

10   Behavioral Analysis Unit, did you complete agent -- FBI

11   agent training at Quantico?

12   A.   Yes, ma'am.

13   Q.   Can you please explain to the ladies and gentlemen

14   what that entails?

15   A.   Yes, ma'am.  So, upon selection to the FBI, every

16   agent is then required to attend the FBI's academy, which is

17   located back in Quantico, Virginia, just a few miles north

18   of our office.  That training is typically a -- or, roughly,

19   a four- or five-month training that provides instruction in

20   various capacities:  Investigative techniques, tactical

21   operations, firearms, defensive tactics, legal, and so

22   forth.  And then, on successfully completing that, you're

23   assigned to a particular field office within the United

24   States.

25   Q.   And what field office were you assigned to?

1    A.   At that time, I was assigned to the Philadelphia

2    Division, in our Ft. Washington Resident Agency, or "RA."

3    And that's just a fancy say of saying that -- "RAs" are

4    typically just referred to as "satellite offices."  So while

5    I was assigned to the Philadelphia division, I didn't report

6    to the headquarter city, but was located in an off-site.

7    Q.   At that time, what type of cases were you

8    investigating?

9    A.   At that time, I primarily investigated white collar

10   crime and violent crime.  And I was assigned there from 2004

11   through the end of 2009.

12   Q.   And what happened in 2009?

13   A.   In 2009, I transferred to what is now referred as the

14   Child Exploitation Operations Unit.  It had a different

15   name -- a couple of different names when I was there, but

16   that is -- "CEOU" is what it's referred to now.

17   Q.   And what is the purpose of that unit?

18   A.   The primary purpose of that unit is, more or less, a

19   central hub to investigate large-scale groups that were

20   engaged in the online sexual exploitation of children that

21   typically span multiple jurisdictions, both here in the

22   United States and overseas.

23   Q.   While you were there, were you actively working on

24   investigations?

25   A.   Yes, ma'am.  So while assigned to that unit, my two

1    primary roles were as case agent and an online undercover

2    agent.

3    Q.   Can you explain to the ladies and gentlemen of the

4    jury what would you do as an online undercover agent.

5    A.   That could take a variety of forms.  One aspect is --

6    and when I refer to "undercover" in an online capacity, it

7    simply means that we're acting in a capacity using something

8    other than our true identities.  So there could be a

9    multitude of activities that we might engage in that could

10   include infiltrating different groups and organizations to

11   collect evidence, review what's being said; review what are

12   the communications and messages between those individuals.

13   It also can include direct one-on-one communications with

14   offenders and also what we refer to as "online identity

15   takeovers," which typically occur when somebody is arrested

16   and they may give us consent to assume their online

17   personas.  And we will assume that online presence and gain

18   access, using those identities, to whatever groups or

19   organizations that they might have been a member of.

20   Q.   And in your role both as the case agent and undercover

21   agent, did you have exposure to certain common behaviors or

22   traits that offenders exhibit when they were trying to

23   sexually exploit children?

24   A.   Yes, ma'am.

25   Q.   Is it fair to say that, since 2009, you've primarily

1   focused your career on sexual exploitation of minors?

2   A.   Yes, ma'am.

3   Q.   I know it's difficult, especially given the time frame

4   you're dealing with, but rough estimate, how many cases do

5   you think that you've investigated regarding child

6   exploitation?

7   A.   Well, it's difficult to estimate, but I would say

8   within my time as both a case agent and my time at BAU, it

9   would be easily be in the hundreds.

10  Q.   And what about the number of offenders that you've

11  investigated?

12  A.   Again, probably easily in the thousands.  And just

13  for -- to help expand on that, back in CEOU, because the

14  groups we investigated were fairly large, we would typically

15  open a case on a single group rather than a separate case on

16  every individual offender, so some of those groups may have

17  had hundreds, thousands, and, in some case, tens of

18  thousands of members.

19  Q.   Special Agent O'Donnell, when we were talking about

20  your work as an undercover agent, do you have a

21  certification in that?

22  A.   Yes, ma'am.  I attended the FBI's online certification

23  undercover course.

24  Q.   Did you leave the Child Exploitation Online Unit in

25  2016?

12

1    A.   Yes, ma'am, in January of 2016 is when I was promoted

2    to BAU III.

3    Q.   And how is one promoted to that position?

4    A.   For agents within the FBI, BAU is considered a

5    supervisory position.  So all supervisory positions for

6    agents are a competitive process.  And so what typically

7    occurs is there's something we refer to as a "posting" that

8    will go out bureau-wide that's available for agents to then

9    compete for that position.

10   Q.   Have you received specific training with regard to

11   child exploitation and sexual abuse of children?

12   A.   Yes, ma'am.

13   Q.   Can you briefly go over that for the ladies and

14   gentlemen of the jury.

15   A.   Again, that's been a variety of trainings since 2009

16   that would easily be in the hundreds of hours related to

17   varies crimes against children, including child sexual

18   abuse, online exploitation, and other crimes against

19   children matters.

20   Q.   And what about when you became promoted to the BAU;

21   additional trainings for your role there?

22   A.   Yes, ma'am.  Typically what occurs upon selection to

23   BAU, you will go through another fairly intensive training

24   process that's about another four or five months, roughly

25   400 to 500 hours worth of training in various behavioral

1   aspects, psychological concepts, in addition to training

2   pertaining to your own specific unit.  And that training is

3   typically provided both by law enforcement, other agents and

4   analysts within BAU, as well as those individuals outside of

5   law enforcement, academic researchers, medical providers,

6   psychologists, psychiatrists, et cetera.

7   Q.   Did you receive any type of certification related to

8   that training?

9   A.   Yes, ma'am.  After that initial stage, there's

10  additional phases of training that typically include

11  rotations to the different units; certain other requirements

12  you have to meet in terms of deployments and training.  And

13  then there is a separation evaluation period that goes

14  through that.  And once you complete that, then you're

15  certified in behavioral analysis, which I was.  I don't

16  remember the exact year, 2016 or 2017.

17  Q.   Special Agent O'Donnell, you told us a little bit

18  about your exposure to offender behavior working on child

19  exploitation cases.  Have you also had exposure to common

20  victim behavior in these types of cases?

21  A.   Yes, ma'am.  I would say, collectively since 2009, I

22  have a reviewed easily tens of thousands of investigative

23  documents related to crimes against children that related to

24  both offenders and child victims.  I have reviewed tens of

25  thousands of communications by offenders and have reviewed

1  hundreds of hours worth of interviews of both offenders and

2  child victims.

3  Q.   Special Agent O'Donnell, I want to segue into the

4  topic of grooming.  Have you had any specialized training

5  with regard to grooming?

6  A.   Yes, ma'am.  Typically, that training would be

7  embedded into other trainings related to child sexual abuse

8  or exploitation, as opposed to being a separate stand-alone

9  trainings, but I've received various trainings in that since

10  I started working crimes against children back in 2009.

11  Q.   And before we get into what your stage definition of

12  "grooming" is, can you just briefly explain, when we use the

13  term "grooming," what are we referring to?

14  A.   Grooming, itself, is just sort of an overarching term

15  that's been used for decades now to describe what are

16  generally clusters of behaviors that are commonly used by

17  certain child sex offenders to engage a child in sexual

18  activity.  So it's more of a general term that has been used

19  for quite some time to describe those behaviors.

20  Q.   And in the last five years, have you given

21  presentations where the main focus is on grooming behaviors?

22  A.   Yes, ma'am.

23  Q.   Special Agent O'Donnell, I don't mean to embarrass

24  you, but I do also want to ask you about some of the awards

25  that you've received throughout your career.  I'd like to

1    just go through them briefly.

2                In 2020, did you receive the Attorney General

3    Award for Distinguished Service?

4    A.   Yes, ma'am.

5    Q.   And that's awarded by the Attorney General of the

6    United States?

7    A.   Yes, ma'am.

8    Q.   And did you also receive that same award in 2016?

9    A.   Yes, ma'am.

10   Q.   And in 2018, did you receive the Director of the FBI's

11   award for Outstanding Criminal Investigation?

12   A.   Yes, ma'am.

13   Q.   Did you receive that same award in 2014?

14   A.   Yes, ma'am.

15   Q.   And in 2018, were you awarded the Medal of Excellence

16   by the FBI?

17   A.   Yes, ma'am.

18   Q.   And in 2017, the Associate Attorney General Award for

19   Exceptional Service in a Criminal Case?

20   A.   Yes, ma'am.

21   Q.   So during the time that you received those awards,

22   were you investigating crimes of sexual exploitation of

23   children?

24   A.   Yes, ma'am, all those were related to crimes against

25   children investigations.

1    Q.    Thank you.  And I'd like to just previous -- briefly

2    discuss any previous testimony that you've given in court.

3    Have you ever been qualified as an expert?

4    A.    Yes, ma'am.

5    Q.    In what area?

6    A.    Both in grooming and in online sexual exploitation

7    investigations.

8    Q.    Have you been recognized as an expert both in state

9    and federal courts?

10   A.    Yes, ma'am.

11   Q.    And let's just talk about specifically this year,

12   2023.  How many times have you been previously recognized as

13   an expert in grooming in federal court?

14   A.    In federal court, in this year, 2023, I believe I was

15   qualified twice.

16           MS. ONG:  All right.  Your Honor, at this time,

17   I'd move the Court to recognize Special Agent O'Donnell as

18   an expert in the area of grooming.

19           THE COURT:  From defense?

20           MS. BOOTH:  Brief approach, Your Honor, if we

21   may?

22           THE COURT:  Sure.

23               (Bench conference.)

24           MS. BOOTH:  Your Honor, I know the Court just

25   ruled on this previously, but I want to make sure we're

1    maintaining an objection for all three of the experts.

2            THE COURT:  That's fine.  They're overruled

3    again.  Whose witness is this?

4            MS. BOOTH:  Mine, Your Honor.

5            THE COURT:  All right.  That's fine.  For the

6    record, it's overruled again.  And I'll recognize him as an

7    expert in front of the jury.

8                (Bench conference concluded.)

9            THE COURT:  All right.  Agent O'Donnell is

10    recognized as an expert in the area of grooming.

11            Ms. Ong, did you have another area or just

12    grooming?

13            MS. ONG:  Just grooming.

14            THE COURT:  All right.  Agent O'Donnell is

15    recognized as an expert in grooming.  Go ahead.

16    Q.  (BY MS. ONG):  All right.  Special

17    Agent O'Donnell, I want to talk to you a little bit

18    more specifically about grooming.  First, can you

19    tell the jury whether or not grooming is considered

20    to be a hard science or a soft science.

21    A.   Typically, grooming would fall into the range of

22    what's considered more of a soft science.  So, generally

23    speaking, hard sciences are more of those that are more

24    mathematically based, like chemistry, physics, et cetera.

25    Soft sciences are more of the behavioral sciences and

1   psychology.  So, in that aspect, it's considered more of a

2   soft science.

3   Q.   Thank you.  And I think we briefly went over this, but

4   now since we're specifically on this subject matter, how is

5   grooming defined, generally?

6   A.   Grooming can be defined as a dynamic process involving

7   a constellation of behaviors that are designed to gain the

8   cooperation of a child for the sexual gratification of an

9   offender.  And, really, that's, again, just a fancy way of

10  saying that there aren't necessarily individual behaviors

11  taken in isolation that might be easily identifiable as

12  grooming, but rather it's the totality of these clusters of

13  behaviors that are designed to manipulate, coerce, or

14  exploit a child into engaging in sexual activity.

15  Q.   And can you tell the jury a little bit of the history

16  of the terminology, "grooming"?

17  A.   So the term, itself, has been used among law

18  enforcement and, at least to the extent that I'm familiar,

19  in the academic world for decades now to describe these

20  different clusters of behaviors and what their purposes and

21  goals are.

22  Q.   And you referenced this a little bit, but are you also

23  familiar with the academic research in this field?

24  A.   Yes, ma'am, generally so.

25  Q.   And are you aware of any research that does not

1    recognize grooming as a real thing?

2    A.   No, ma'am.

3    Q.   Are there universal goals that are generally agreed

4    upon by the research communities with regard to an

5    offender's behavior when they're engaging in grooming?

6    A.   Yes, ma'am.  Both in my experience and my

7    understanding of the research into grooming, there are

8    essentially three primary goals of the process.  And the

9    first is to facilitate the sexual abuse of a child.  The

10   second is to prevent discovery of the activity from those

11   around the child.  And then the third is to help mitigate,

12   delay, or prevent disclosure of that activity by the child.

13          MS. ONG:  Your Honor, at this time, I would move

14   for the admission of Government's Exhibits 30 and 31.

15          THE COURT:  What's defendant's position on 30 and

16   31?

17          MS. BOOTH:  No objection, Your Honor.

18          THE COURT:  All right.  They're both admitted.

19   (Government's Exhibits 30 and 31 were admitted into

20   evidence.)

21          MS. ONG:  Thank you, Your Honor.

22   Q.   (BY MS. ONG):  Agent O'Donnell, can you

23   explain -- when you define "grooming," do you define

24   it in different stages?

25   A.   Yes, ma'am.  I'll describe five stages of grooming;

1    although, the important thing to remember is that these

2    stages are more of an overarching framework to help describe

3    the clusters of behaviors, their purposes, and how they're

4    interconnected, and that grooming is not necessarily a

5    step-by-step process in which you must engage in one

6    behavior before engaging in another, but rather is much more

7    dynamic and is more of a cycle.  Different behaviors may

8    have different purposes and may span across multiple stages,

9    so it's more of a framework as opposed to a step-by-step

10   process.

11   Q.   And I'm sorry, Special Agent O'Donnell, before you get

12   into the actual five stages, can I please see Government's

13   Exhibit 30?

14            Special Agent O'Donnell, do you recognize this

15   exhibit?

16   A.   Yes, ma'am.

17   Q.   What is it?

18   A.   This is a graphical representation of the five stages

19   of the grooming process.

20   Q.   All right.  And if you could now explain to the jury

21   what the first stage is.

22   A.   So the first stage, as depicted on the screen, is

23   identifying a potential target.  And what this simply refers

24   to are attempts by an offender to initially identify a

25   potential child in order to engage or exploit sexually.  And

1    there are three broad concepts that are related to this

2    stage, and those are availability, vulnerability, and

3    desirability.

4    Q.   Special Agent O'Donnell, in Government's Exhibit 30,

5    did you make this exhibit yourself?

6    A.   I created the PowerPoint slide, yes, ma'am.

7    Q.   Okay.  And so we see this here kind of going in a

8    circle.  Why do you have the stages going a circle?

9    A.   Again, this is a representation of what I referenced

10   earlier that it's not necessarily a step-by-step process,

11   but it's more of a cycle and a continual dynamic process

12   that occurs over time.

13   Q.   Can I please see Government's Exhibit 31?

14           Special Agent O'Donnell, do you recognize this

15   exhibit?

16   A.   Yes, ma'am.

17   Q.   What are we looking at here?

18   A.   Again, this is a graphical representation of those

19   three concepts I referenced related to the first stage:

20   Availability, vulnerability, and desirability.

21   Q.   Can you go into more detail about each of the

22   different phases -- stages?

23   A.   Do you mean the three concepts?

24   Q.   The three concepts, excuse me, yes.

25   A.   Yes, ma'am.  So the first concept of "availability,"

1    that simply refers to how available a child is to an

2    offender or how much access an offender may have to a

3    particular child.  In addition to what types of behaviors

4    that offender may have to engage in, in order to gain

5    access, in order to increase access, or sustain that access

6    over a period of time, as well as breaking down any

7    potential to barriers to that access or preventing the loss

8    of access to that child.  So that is the first concept with

9    availability.

10   Q.   Can you think or give us some examples of what makes a

11   child more or less available to an offender?

12   A.   So it may certainly depend on the circumstances.  So,

13   generally speaking, caregivers have a significant amount of

14   access to their own children, whereas other individuals may

15   have varying degrees of access.  So a teacher may have

16   access in terms of a school setting, a doctor may have

17   access in terms of a medical provider, religious figures may

18   have access in that particular community or church.  And

19   those different levels of -- or those different positions

20   may allow for different or more broad access over time.

21   Q.   What about someone who is in a romantic relationship

22   with someone who is close to a child?

23   A.   Certainly possible that that would increase the

24   access, depending on what the circumstances were of that

25   relationship.

1    Q.   Can you please now go through vulnerability.

2    A.   So "vulnerability" refers to anything in a child's

3    life that may make them susceptible to manipulation or

4    coercion or exploitation.  So not all kids are the same.

5    Different children may have different vulnerabilities and

6    the same child may have more than one.  But it can be

7    helpful to think about these vulnerabilities in terms of

8    being either "tangible" or "intangible."  By "tangible

9    vulnerabilities," that just refers to those things in the

10   child's life that might be a little bit more observable to

11   those around the child.  So that could be financial

12   distress, malnutrition or neglect, if there's visible signs,

13   lack of parental supervision, behavioral problems, physical

14   abuse, just things that might be a little bit more

15   observable by the people around the child.

16          On the other hand, with "intangible

17   vulnerabilities," that reference to those vulnerabilities

18   that just might be more internal to a child.  It might be a

19   little bit more difficult for those around that particular

20   child to see.  So those can be things like lack of

21   self-esteem, poor self-image, lack of a sense of belonging,

22   anxieties, worries, fears, things like that that just might

23   be a little more difficult to observe.

24          And then there are other categories of

25   vulnerabilities that sometimes aren't thought of such; for

1    example, one of those may be the concept of sex itself.

2    Depending on the age and development of a child, they may

3    not have any type of concept as to what sex is or what it

4    even means, whereas other children may become more curious

5    about sex, may see physical changes to their bodies, may

6    have more sexualized thoughts.  And those are areas that can

7    be rife for manipulation.

8         And the last category are, again, things that may

9    not necessarily always be thought of as vulnerabilities, but

10    the mere -- generally speaking, children don't necessarily

11    enjoy the same freedoms that adults do and are often under

12    the control and authority of adults more so than other

13    adults are with each other.  And so there's often a power

14    differential between an adult and a child or a differential

15    in authority, and so simple wants or desires of a child can

16    be vulnerabilities; say, for example, a desire for more

17    freedom.

18         So all of those different things can be different

19    types of vulnerabilities that different children can have or

20    that even the same child may have more than one.

21    Q.   What about "desirability"?

22    A.   By "desirability," that refers to what a particular

23    child sex offender's sexual preferences are.  And that may

24    be somewhat unique to that particular sex offender.  For

25    some child sex offenders, they have very specific

1    preferences.  That might be age, a specific gender, hair

2    color, eye color, ethnic background, skin tone, et cetera.

3    For other offenders, it may be much more general or much

4    more broad, maybe an approximate age range or just gender.

5           But the key is that all of these three concepts

6    interact when potentially identifying a child.  And what we

7    sometimes see is that although each of these factors are

8    relevant that sometimes availability and vulnerability might

9    be weighted a little bit more heavily.  And what I mean by

10   that is, say, for an example, an offender has a specific

11   sexual preference for two different children, but only one

12   of those children he's able to gain access to or sustain

13   that access over time; that child may then become the

14   target.  Likewise, if that offender has similar sexual

15   preferences for two children and similar level of access,

16   but, one child, he's able to more exploit some of those

17   vulnerabilities, then that child may then become the target

18   of those sexual advances.

19   Q.   And all three of these components, are they

20   interconnected?

21   A.   Yes, ma'am.

22   Q.   Can I please see Government's Exhibit 30?

23          THE COURT:  Ms. Ong, before we go on to the next

24   exhibit, it's almost five o'clock.  Is this a good place for

25   you to stop?

1           MS. ONG:  Absolutely.

2           THE COURT:  All right.  Ladies and gentlemen,

3   we're going to end for the day.  We'll start again tomorrow

4   morning.  We're going to start no later than 8:30, so please

5   be here no later than 8:15 so we can start on time.  Before

6   I let you go, I'm going to read you an instruction.

7           When you leave here, friends or family may ask

8   about your day of jury duty.  As I mentioned earlier today,

9   you may not discuss any of the evidence in this case with

10  anyone until deliberations are completed; that includes

11  family and close friends.  Also you must not hear or read

12  about this trial or do any sort of your own research.  The

13  reason for this, again, is that your decision must be based

14  solely on the evidence presented at the time.

15          With that, all rise for the jury.

16              (Jury not present.)

17          THE COURT:  All right.  Everybody can be seated.

18          All right.  Before we end for the day, is there

19  anything else I can do?

20          For the Government?

21          MS. ONG:  No, Your Honor.

22          THE COURT:  For Defense?

23          MR. BENJAMIN:  Not actually totally case-related

24  Your Honor:  We had had, at different times, access for

25  staff with cell phones and so --

1          THE COURT:  Who wants to bring in their cell

2     phone?

3          MR. BENJAMIN:  My wife, Your Honor.

4               (Discussion off the record.)

5          THE COURT:  Ms. Chavez is going to send an e-mail

6     for your wife.

7          MR. BENJAMIN:  Thank you, Your Honor.

8               (Discussion off the record.)

9          THE COURT:  Anything else?

10          MR. BENJAMIN:  I don't have anything else.

11          THE COURT:  Don't be here any later than 8:15.

12          MR. BENJAMIN:  Understood, Your Honor.

13          THE COURT:  And you can leave everything here.

14          MR. BENJAMIN:  Entry went good this morning, so

15     we'll do the same thing.

16          THE COURT:  All right.  Sounds good.  See you in

17     the morning.

18      The proceedings adjourned at 4:59 P.M. and reconvened on

19               Friday, July 7, 2023, at 8:21 A.M.)

20

21

22

23

24

25

1                    UNITED STATES OF AMERICA

2                     DISTRICT OF NEW MEXICO

3

4               CERTIFICATE OF OFFICIAL REPORTER

5          I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

6     Federal Official Court Reporter in and for the United States

7     District Court for the District of New Mexico, do hereby

8     certify that pursuant to Section 753, Title 28, United

9     States Code, that I did report in stenographic shorthand to

10    the best of my skill and ability the foregoing pages 1-27 of

11    Part 1 of 2 of the proceedings set forth herein, that the

12    foregoing is a true and correct transcript of the

13    stenographically recorded proceedings held in the

14    above-entitled matter and that the transcript page format is

15    in conformance with the regulations of the Judicial

16    Conference of the United States.

17

18    Dated this 4th day of August 2023.

19

20    S/Electronically Filed
      Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
21    Federal Official Court Reporter
      100 N. Church Street
22    Las Cruces, NM 88001
      Phone: (575) 528-1430
23    Email:  Vanessa_Alyce@nmd.uscourts.gov

24

25

                    UNITED STATES DISTRICT COURT
           100 N. Church Street, Las Cruces, NM  88001
                         (575) 528-1430