1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3
     UNITED STATES OF AMERICA,        )
4                                     )
                    Plaintiff,        )
5                                     )
                    vs.               )   NO: 22-CR-1561 MIS
6                                     )
     MICHAEL RIVERA,                  )
7                                     )
                    Defendant.        )
8

9

10            PARTIAL TRANSCRIPT OF PROCEEDINGS
                        JURY TRIAL
11      (*Trial testimony of Daniel E. O'Donnell, Part 2 of 2*)
           BEFORE THE HONORABLE MARGARET I. STRICKLAND
12              UNITED STATES DISTRICT JUDGE
                    FRIDAY, JULY 7, 2023
13         LAS CRUCES, DOÑA ANA COUNTY, NEW MEXICO

14

15

16

17

18

19

20

21      (Proceedings recorded by machine shorthand and
     transcript produced by Computer-Aided Transcription.)
22
     REPORTED BY:     VANESSA I. ALYCE CHAVEZ, CRR, RPR, NMCCR
23                    Federal Official Court Reporter
                      100 N. Church Street
24                    Las Cruces, NM  88001
                      Phone:  (575) 528-1430
25                    Email:  Vanessa_Alyce@nmd.uscourts.gov


                    UNITED STATES DISTRICT COURT
           100 N. Church Street, Las Cruces, NM  88001
                         (575) 528-1430

```
 1

 2     Appearances of Counsel:

 3

 4         FOR THE UNITED STATES:

 5

 6                     UNITED STATES ATTORNEY'S OFFICE
                       District of New Mexico
                       100 N. Church St.
 7                     Las Cruces, NM  88001
                       BY:  MARISA ONG, ESQ.
 8                          R. ELIOT NEAL, ESQ.

 9         FOR THE DEFENDANT:

10                     LAW OFFICES OF BROCK BENJAMIN
                       609 Myrtle Ave., Ste. B
11                     El Paso, TX 79901
                       BY:  BROCK BENJAMIN, ESQ.

12             and

13                     SHAHARAZAD MCDOWELL BOOTH, LLC
                       P.O. Box 13856
14                     Las Cruces, NM 88013
                       BY:  SHAHARAZAD BOOTH, ESQ.

15

16

17     Also Present:  Ashley Rousse, Staff, U.S. Attorney's Office
18                    Monica Benjamin, Staff, Benjamin Law Office

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

```
 1                        I N D E X

 2    WITNESSES FOR THE GOVERNMENT:                    PAGE

 3    DANIEL E. O'DONNELL

 4         Direct Examination Cont.'d by Ms. Ong        4
           Cross-Examination by Ms. Booth              22
 5         Redirect Examination by Ms. Ong             38

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                              * * * * * * *

3                      (Begin partial transcript.)

4           THE COURT:  Thank you.  You may be seated.

5           Welcome back, ladies and gentlemen.  We're going

6    to continue with the testimony of Special Agent O'Donnell.

7           Agent, you're still under oath from yesterday.

8           THE WITNESS:  Yes, Your Honor.

9           THE COURT:  Ms. Ong.

10          MS. ONG:  Thank you, Your Honor.

11                        **DANIEL E. O'DONNELL**,

12          After having been previously sworn, did make the

13   following answers:

14                   **DIRECT EXAMINATION (Continued)**

15   Q.  (BY MS. ONG):  Special Agent O'Donnell,

16   yesterday, I believe we left off after you were done

17   explaining desirability within the first stage,

18   identifying a target; is that what you recall?

19   A.   Yes, ma'am.

20   Q.   All right.  And can I please see Government's

21   Exhibit 30.

22          So I now would like you to move to the second

23   stage that you have up on Government's Exhibit 30.

24   A.   Yes, ma'am.  So the second stage -- and, again, as I

25   referenced yesterday, this is more of a framework and not

```
 1    necessarily a step-by-step process, but the second stage is
 2    what we refer to as "establishing a connection."  And this
 3    stage refers to, generally speaking, attempts by an offender
 4    to initially engage a child or the child's caregivers or
 5    other surroundings to create a favorable impression or to
 6    create a positive impression to essentially lay the
 7    foundation for future interactions to occur.  And so it's
 8    fairly common that a lot of these types of behaviors may
 9    look otherwise benign.  For example, using flattery or
10    commenting -- showing affection or showing attention early
11    on is fairly common; taking an interest in something that
12    the child that might be interested in -- say, sports, games,
13    movies, hobbies, interests, attitudes, or beliefs -- things
14    that, again, can create that favorable impression and serve
15    sort of as a jumping-off point and be able to come back and
16    interact with the child in the future.  With some offenders,
17    it's also common that they may alter the way in which they
18    communicate where some offenders may lower that
19    communication to more of a childlike level when they're
20    speaking with a child.  Others may elevate the child to more
21    of an adult status by referring to -- saying how mature they
22    are, how adult-like they are.
23           This stage also doesn't happen -- necessarily be
24    limited to the child, but it can also be part of the people
25    around the child, like, say, the caregivers.  And so, again,
```

1    offenders want to create that favorable impression, again,

2    to form a level of trust and friendship.  This is also a

3    good example of why this isn't a step-by-step process,

4    because these behaviors serve multiple purposes.  So on one

5    hand, that creates opportunity to come back and engage in

6    the future, but on the other hand, it also provides some

7    information as to the level of access that an offender might

8    have or might need to increase in the future.  So it serves

9    multiple goals, but the overarching purpose of this is to be

10   able to serve as a jumping-off point and be able to come

11   back and interact with this child again in the future.

12   Q.   And Special Agent O'Donnell, just to be clear, you're

13   not saying that every adult who engages in that type of

14   behavior is grooming a child?

15   A.   Not at all.

16   Q.   These are just common traits that you've seen in cases

17   where individuals are engaging in grooming?

18   A.   Yes, ma'am.

19   Q.   All right.  When you're talking about offenders

20   engaging in Stage 2, do you expect their conduct to be

21   adaptable?

22   A.   Yes, ma'am, it very well can be.

23   Q.   Can you give an example of that?

24   A.   So, for example, if an offender believes that a child

25   may have a certain interest or like or hobby or some kind of

1    game or something that they enjoy, the offender might try to

2    engage the child in that, only to discover that isn't what

3    the child is interested in.  That may be a sign, "Okay, I

4    need to learn -- gather up more information, learn more

5    about the child and come back later on."  So it can be very

6    adaptable depending on the child's interests and

7    circumstances.

8    Q.   And, in your experience, is it easier for an offender

9    to establish a connection, let's say, for example, if a

10   minor's caretaker is somewhat absent?

11   A.   Yes, that can be a contributing factor.

12   Q.   All right.  And so can you now explain how we

13   transition from Stage 2 into Stage 3?

14   A.   Yes, ma'am.  So Stage 3 is what we are refer to as

15   "gathering more information."  And what this refers to are

16   attempts by offenders to learn as much as they can about the

17   child, the child's home life, the child's surrounding, the

18   child's community; in that the more information that an

19   offender has about a child, the more opportunities that

20   offender has to take advantage of those and manipulate and

21   exploit those, and fill in whatever gaps or voids that a

22   child may have.  And so, for example, the more an offender

23   knows about a child's likes, dislikes, hopes, fears,

24   anxieties, worries, attitudes, values, beliefs, the more

25   opportunities that offender has to begin to fill those needs

1    that I'll describe in the next stage.

2             Similarly, as I described in the last stage, this

3    doesn't have to necessarily just be limited to the child or

4    the children themselves.  Those around the child -- the more

5    that they can learn, say, about the child's caregivers, the

6    child's home life, levels of supervision, levels of

7    affection or attention that they can see in the home, the

8    more opportunities an offender has to then engage that

9    caregiver as well.  For instance, if a caregiver is simply

10   busy, an offender may be able to come in, offer up

11   babysitting, offer up rides, things like that.

12            Again, this can serve multiple purposes.  On the

13   one hand, it allows an offender to learn more about what

14   types of needs that child may have, but it also allows the

15   offender to, again, learn more about the access and ways of

16   potentially isolating the child and spending more time alone

17   with that child.  And so that is one of the purposes of this

18   stage, so to speak, is offenders attempting the early stages

19   of establishing those friendships, starting to develop a

20   relationship.  And the goal is to begin to put themselves in

21   a trusted position over that child to where they create an

22   actual relationship with the child and begin to isolate that

23   child from other people and create the potential that the

24   child becomes more and more dependent on that offender.

25   Q.   In this gathering information stage, would you expect

1    that some of the conduct that the offender's engaging in can

2    appear benign or innocent to an onlooking party?

3    A.   Again, it could, yes, ma'am.

4    Q.   What about from the child's perspective?

5    A.   Yes, ma'am.

6    Q.   All right.  And as we move on to Stage 4, filling

7    needs and exploiting vulnerabilities, what is the goal of

8    that stage?

9    A.   So the stage refers to -- as the offender continues

10   and has learned about the child's circumstances and

11   continues to learn about the child's circumstances, this is

12   the stage that refers to -- attempts to be able to then fill

13   in those gaps or exploit those needs and vulnerabilities.

14   So, for example -- yesterday, I referenced the tangible and

15   intangible vulnerabilities, so, for example, a tangible

16   vulnerability is, let's say, poverty or financial distress.

17   That may allow an offender to come in and purchase things

18   for the child that they may not otherwise have access to in

19   their life.  It provides them with a benefit they may not be

20   able to get otherwise.  Those can be gifts, toys, clothing.

21   Oftentimes, that can escalate into trips, vacations,

22   overnight stays, going to sporting events, things like that.

23   But, similarly, those intangible vulnerabilities that I

24   mentioned, those things that are more internal to a child --

25   say, poor self-esteem or lack of sense of belonging -- it's

1    also fairly common to see offenders to begin to fill in

2    those gaps as well:  Showering the child with affection or

3    providing the child maybe with structure or attention and

4    affection that they're not getting otherwise; to comment on

5    how special the child is, how unique they are; to offer

6    encouragement, benefits that that child may be missing in

7    other aspects of their lives.  And although those aren't

8    tangible gifts, these types of gifts can invoke a pretty

9    well-established concept that's known as "reciprocity."  All

10   that refers to is that, when we are given a gift by

11   somebody, it can create a sense of indebtedness towards that

12   person and it can create a sense of obligation to pay that

13   back.  And those effects are particularly powerful when

14   those gifts are both unexpected and meaningful to that

15   person.

16           So, from a child's perspective, having access and

17   getting these benefits that they may not otherwise have,

18   that can have a pretty powerful effect.

19   Q.   And just to be clear, Special Agent O'Donnell, when

20   you're giving these examples, you're not saying, in every

21   instance of grooming, an offender is perhaps giving a

22   tangible gift, such as, like, paying for things; is that

23   right?

24   A.   Not necessarily so.

25   Q.   Okay.  And so if you had an offender who is engaging

1   in kind of the intangible benefits that you referenced, but

2   was not actually giving tangible gifts, would you rule them

3   out as someone who is engaging in grooming behavior?

4   A.   Not at all.  And, again, that comes back to what the

5   offender knows about the child, what the child may need,

6   what the child may want, and filling those specific needs

7   specifically to that child.

8   Q.   We've already kind of touched on this, but I just want

9   to clarify.  So, if a child has, say, perhaps a missing

10  parental figure in the home, in your experience, how does

11  that play into this fourth stage that we are talking about?

12  A.   So, in that particular stage, that provides an

13  offender multiple opportunities to step in to potentially

14  take on more of a caregiver role, to provide more attention

15  or affection that may be missing in that child's life, to

16  offer encouragement, and to offer a structure that may not

17  be there.  And what is also common in this stage is to see

18  an escalation in these types of behaviors and the

19  communications with a child may take on more of a deeper

20  relationship.  So common communications in this particular

21  stage are to refer to the child as to how special they are,

22  how unique they are, where offenders will comment on this

23  relationship is the most important relationship in the

24  offender's life; the offender understands the child, while,

25  at the same time, maybe making disparaging comments towards

1   other people in the child's life -- "I can't believe other

2   people aren't there for you; I would never let this happen

3   to you; you can always rely on me" -- while, at the same

4   time, also placing the child in more of an adult-like

5   relationship status as well by referring to the child, for

6   example, as "you are the only one who truly understands me"

7   and constantly referring to how special this is, how unique

8   this relationship is.

9            And the goal of this is to begin to develop that

10  bond between the child and the offender, to begin to isolate

11  that child emotionally or psychologically from other people

12  in their lives, and to create a sentence of dependency on

13  the offender.  And what's important in this stage as well

14  is, as these are going on, the communications tend to take

15  on more of a romantic side of where the offender refers to

16  being in love with the child, how they are -- the child is

17  their best friend, that they'll always be there; they can't

18  imagine being anywhere else, but that the very important

19  thing is that other individuals may not understand this.

20  And so that's why it's very important to keep the secret;

21  that "this is just between you and me; other people likely

22  won't understand this, so it's very important that we keep

23  this between us."  And, again, this can be very powerful.

24  And the goal is to create that dependent relationship, to

25  put that offender in the position of providing these types

1    of benefits that the child may not otherwise have and create

2    that sense of dependency on the offender and isolate them

3    from other people in their lives.

4    Q.    Special Agent O'Donnell, you made reference to an

5    offender expressing to a child that the child is their best

6    friend.  What about the reverse?  Have you seen situations

7    where the child, themself, feels like the offender is their

8    best friend?

9    A.    Absolutely.  And that's a product of these behaviors.

10   And this process is, again, to put that -- or offenders who

11   try to put themselves in that position where the child

12   believes that they are the sole person that they may be able

13   to disclose to; that they are in this trusted, loving,

14   romantic relationship.  And while it's possible that there

15   may be sexual conversations going on as well or some type of

16   sexual activity, typically what we see is that the more

17   significant sexual activity may not progress until there's

18   at least some level of potential trust that the offender has

19   been able to establish prior to engaging in more of the

20   sexual activity.

21   Q.    Special Agent O'Donnell, you mentioned earlier how a

22   child or an adolescent's curiosity about sex would be a

23   vulnerability.  Can you explain that more?

24   A.    Yes, ma'am.  That particular instance can allow an

25   offender to put themselves in a mentorship-type position or

1    a teacher, encouraging the child to ask questions,

2    encouraging the child to talk about whatever sexual thoughts

3    or confusion or feelings that they may have, to talk about

4    changes in their body or physiological arousal.  That,

5    again, provides that offender with, one, information that

6    they can then utilize, but, again, it also creates that more

7    trusted relationship where the child begins to feel more

8    comfortable talking about these types of activities.

9    Q.    Before we move to Stage 5, was there anything else in

10   Stage 4 that you wanted to cover?

11   A.    No, ma'am, I don't believe so.

12   Q.    Let's move to Stage 5, lower inhibitions.

13   A.    This stage refers to what is typically a gradual

14   process of desensitizing a child to both physical contact,

15   sexual contact, or sexual conversations.  So in a

16   face-to-face setting, what we see are a gradual escalation

17   of behaviors.  And, early on, many of these behaviors can

18   look otherwise benign.  So things like high-fives, pats on

19   the back, quick pat on the shoulder.  Those types of

20   behavior help the offender in multiple ways.  On the one

21   hand, it begins to normalize the physical contact between an

22   offender and the child, but also allows the offender to

23   gauge the child's reaction.  If a child recoils or rebuffs,

24   the offender may know, "Okay, he's not quite ready or she's

25   not ready and I may need to back up."

1          The other thing that this allows is, because

2     these otherwise are -- appears as benign behaviors, it

3     allows the offender to engage in these behaviors in a public

4     setting or even in front of caregivers, who may not

5     recognize anything different, as they are normal everyday

6     behaviors.  And what that can infer to a child is that if

7     these are done in front of a caregiver or custodian and

8     there's no reaction that these are acceptable behaviors.

9          So, again, in a face-to-face setting, it's often

10    that we see this increase in frequency and intensity and

11    duration of these types of behaviors.  So those quick

12    pats -- or pats on the head or high-fives may become back

13    rubs, longer hugs, more skin-to-skin contact.  And, again,

14    the goal is to begin to break down what are natural barriers

15    or boundaries.

16          It's also common in those types of settings,

17    then, as more of the sexualized contact is introduced,

18    oftentimes that's introduced using manipulation or deception

19    methods of games, things like tickling, wrestling; depending

20    on the child's age or development, maybe sleeping next to

21    the child, bathing the child, changing in front of the child

22    where, again, the goal is to normalize these behaviors; to

23    normalize that physical contact; to normalize the child

24    being naked in front of an offender; to normalize an

25    offender being naked in front of a child.

1          And what is also common in this stage as well

2     is -- whether it's a face-to-face or in an online setting,

3     is seeing more of the introduction of more sexualized

4     contact or sexualized communications.  That often can take,

5     initially, the forms of just sexual innuendoes, sexual

6     jokes, just encouraging talking about sex, in general.  That

7     generally leads to more direct conversations about a

8     child -- encouraging the child to talk about their sexual

9     interests, what they may be feeling, what they may think

10    about, and encouraging the child to disclose those to the

11    offender.  It's common for offenders to also reciprocate by

12    telling the child about their sexual thoughts, asking the

13    child what the child would want the offender to do to them

14    if they were together, encouraging the child maybe to take

15    and send photos in various stages of undress or encouraging

16    the child to masturbate and to also send those images or

17    videos.  Offenders often will send similar images or videos,

18    sometimes of themselves, back to the child.

19         It's also common in this stage that offenders may

20    also show pornography to a child, whether that's adult

21    pornography or what is sometimes referred to as "child

22    pornography," that now more commonly we refer to it as

23    "child sexual abuse materials."  Again, the goal of that, or

24    one of goals of that is to normalize that behavior, to

25    demonstrate that this is a normal activity.  But the key

1    behind this is, as these -- increase in this sexualized

2    conduct is occurring, it's not occurring in isolation.  It's

3    occurring in the totality of all the other behaviors that I

4    mentioned and in the context of building this trusted,

5    dependent, isolated relationship, and that this is a special

6    and unique relationship and that it should be kept secret,

7    and that the child should not disclose this to anybody,

8    because they wouldn't understand what can happen.  And so

9    it's the totality of all of these behaviors and the

10   persistence of offenders in terms of how many messages they

11   may send, constantly checking in on the child or requiring

12   the child to check in with them.  It's the combination of

13   all of these behaviors that can lead to what are sometimes

14   counterintuitive responses by children where they go along

15   with the abuse and either delay or not disclose it at all.

16     Q.    So, Special Agent O'Donnell, you went through a bunch

17   of things there.  I just kind of want to break down some of

18   that and also ask you specific questions with regard to

19   lowering inhibitions.

20            In your experience, have you ever seen situations

21   where is an offender gives a minor alcohol in order to lower

22   their inhibitions?

23     A.    Yes, ma'am.  Alcohol and drugs are also a fairly

24   common part of this process.

25     Q.    What about a situation where an offender might talk

1    about being together when the child is older, say, of an

2    appropriate age?

3     A.   Again, that's also typical, of promising the child

4    that they'll be together forever, that they're in love with

5    the child, referring to their future life together with just

6    the two of them.

7     Q.   And, at the end there, you started to talk about

8    victim behavior, and so now I kind of want to shift into

9    that.

10          In your experience, when a child experiences this

11   kind of sexual abuse by an offender, do they disclose right

12   away?

13    A.   In my experience, it's far more common that the

14   children generally don't disclose right away, if at all.

15    Q.   And, in your experience, have you seen situations,

16   when the child or minor is initially confronted with

17   inappropriate behavior by an offender, that they actually

18   deny it?

19    A.   Again, I would say that's not an uncommon occurrence.

20    Q.   And then another thing that I just wanted to make

21   clear:  When an offender is engaging in these stages, this

22   type of behavior, in your experience, do these different

23   things sometimes confuse the child?

24    A.   Yes, ma'am.  Part of that confusion is the child may

25   recognize that they're receiving these benefits that they're

1    not getting in other aspects of their lives.  That may

2    create a positive impression of the offender.  It may create

3    positive feelings of attachment toward the offender.  While

4    also trying to navigate the sexual activity that's occurring

5    as well, that can be a very difficult situation for children

6    to navigate and to make sense of.

7    Q.    And could this have an impact on the child's

8    perception of their own voluntariness regarding their

9    behavior?

10   A.    Yes, ma'am.  Children may feel complicit in the sexual

11   activity based on the fact that they may have received those

12   benefits and may feel as though they are guilty for

13   accepting those benefits and either not recognizing the

14   sexual activity sooner or feeling guilty for having accepted

15   those benefits and then turning around and disclosing.  It's

16   also common for offenders to remind the child that they are

17   the only person they provided these benefits to and that the

18   child accepted those benefits, and that can have an impact

19   on whether or not the child discloses.

20            MS. ONG:  Your Honor, may I have a moment?

21            THE COURT:  Sure.

22               (Discussion off the record.)

23   Q.   (BY MS. ONG):  Special Agent O'Donnell, in a

24   minute, I'm going to let Ms. Booth come up here and

25   ask a couple questions.  Before I do that, is there

1    anything I didn't ask you that you think would be

2    helpful in explaining the grooming process to the

3    jury?

4    A.   The only additional things I can think of are

5    additional reasons that the child may not disclose after

6    going through this process.  There can be a fear of not

7    being believed.  Especially for offenders who might be in a

8    trusted position over the child, if they did not disclose

9    right away, they may then fear, if they disclose later on,

10    that people will ask questions as to why they did not

11    disclose earlier and may not believe them, so they stay

12    quiet.  And that can cause them to feel trapped.

13         It's also common for offenders to remind them of

14    their position as a child and that other adults may not

15    believe them.  But there can be additional reasons that

16    children may not disclose either.  There may be a sense of

17    shame or embarrassment for having engaged in these behaviors

18    and having to disclose that to people, whether it's law

19    enforcement or friends or family that -- that may now

20    realize what occurred.  And there can also be a sense of --

21    part of the grooming process is to create that dependent

22    relationship.  And if a child doesn't feel as though they

23    have a trusted individual to whom they can go disclose, that

24    can also cause them to stay quiet for longer.

25         Other behaviors that may occur.  It's common for

1    offenders to remind the child that this is a secret and that

2    if the child were to disclose that that could get the

3    offender into trouble and that would be potentially the

4    child's fault.  It's also common for offenders to remind the

5    children that they may lose access to these benefits if they

6    were to disclose.  And, again, there may be some of these,

7    whether they're tangible or intangible, that might be the

8    only area in the child's life where they're receiving those.

9    So it can be an incredibly confusing situation to navigate.

10   And, again, it's the totality of all of these behaviors that

11   can lead to, again, the child engaging in sexual activity

12   and then not disclosing it.

13   Q.   Special Agent O'Donnell, you actually reminded me of

14   one other question I have for you.

15        What about a situation where, let's say, some --

16   an adult in the minor's life does find out about the

17   inappropriate behavior but doesn't report it to law

18   enforcement, doesn't really do anything to make sure it's

19   not occurring?  How would that impact the child's perception

20   of what's going on?

21   A.   That could have a very powerful impact.  If the child

22   is aware or potentially aware that another trusted adult is

23   at least somewhat aware of what's occurring and doesn't do

24   anything, it might confirm to the child that maybe they

25   won't be believed.  It may cause a child to fear whatever

1    repercussions that might occur if they did disclose.  And

2    that can cause additional confusion to the child.  If they

3    feel as though the activity was wrong but they have another

4    trusted individual in their life who is accepting of it,

5    again, it just can create a very confusing situation to that

6    child to try to navigate.

7              MS. ONG:  Thank you.  I pass the witness.

8              THE COURT:  Cross-examine?

9              MS. BOOTH:  Thank you, Your Honor.

10             May it please the Court.

11                        **CROSS-EXAMINATION**

12   Q.  (BY MS. BOOTH):  Good morning, Agent.

13   A.   Good morning.

14   Q.   Yesterday, you went through a great deal of your

15   awards and accolades, your training and your experience.

16   And you remember, when you and I spoke, you told me that

17   that was all through your agency, the FBI, correct?

18   A.   I believe the -- my employment is through my agency.

19   I've received training both from the agency, other outside

20   agencies, and then other individuals not associated with law

21   enforcement.

22   Q.   When we went through your CV in a previous hearing and

23   I asked you about a training that occurred outside of the

24   FBI in the past five years, you pointed to one, correct?

25   A.   I believe you asked me to point to one.

1    Q.    Okay.  Now, can you think of any more than that one

2    that we spoke about that happened in the past five years?

3    A.    Again, if I had my CV in front of me, that would be

4    helpful.

5    Q.    Let me ask you something different.

6              MS. ONG:  Your Honor, may we approach?

7              THE COURT:  Sure.

8              (Bench conference.)

9              MS. ONG:  Your Honor, I think it's confusing for

10   her to be referencing a previous time that they spoke.  I

11   think, if she wants to lay more of a foundation so that the

12   jury understands that there was a previous hearing -- I did

13   hear her mention that, but it might be more appropriate for

14   her to just ask her questions now.  And then, obviously, if

15   she's going to be impeaching him about something, she can

16   refer to the previous hearing.  I'm just worried the jury

17   may not know what's going on when she keeps referencing "the

18   last time that we spoke."

19             MS. BOOTH:  Your Honor, I asked him a specific

20   question; he said that's not what occurred.  So I asked the

21   exact question I asked him in that hearing:  "Have you had

22   other trainings?"  And then he said something open-ended.  I

23   said, "In the previous hearing, you said this to me."  I

24   don't know what other foundation I can lay, other than to

25   further confuse the jury with dates and what kind of hearing

UNITED STATES DISTRICT COURT
100 N. Church Street, Las Cruces, NM  88001
(575) 528-1430

1    it was.

2              THE COURT:  I'm going to overrule the objection.

3    If you impeach him, though, you have to use something to

4    impeach him, not just say, "Well, this is what you said,"

5    and -- that hasn't happened yet, but if it does...

6              MS. BOOTH:  All right I won't do that.

7              THE COURT:  Okay?

8              MS. BOOTH:  Yes, Your Honor.

9              THE COURT:  Okay.  Thank you.

10             (Bench conference concluded.)

11   Q.  (BY MS. BOOTH):  Agent, would you agree with me

12   that most of the trainings you've had have been

13   law-enforcement geared, correct?

14   A.   The trainings related to my law enforcement capacity,

15   yes, ma'am.

16   Q.   In relation to the grooming that you're here as an

17   expert to testify to, your experience and your education has

18   been based in law enforcement, correct?

19   A.   Law enforcement and instruction by outside individuals

20   as well.

21   Q.   "Law enforcement and instruction based on [sic]

22   outside individuals"; that's what you just said, correct?

23   A.   Yes, ma'am.

24   Q.   And those outside individuals are trainings that were

25   given to you through your employment as an FBI agent,

1   correct?

2    A.   I received the trainings through my FBI employment,

3   but some of those trainings were not by FBI personnel.

4    Q.   Yesterday, you told -- you agreed with the prosecutor

5   when she asked you, "There's no research that does not

6   recognize 'grooming' as a real thing."  Do you remember

7   agreeing to that?

8    A.   At least of the research that I'm familiar with, yes,

9   ma'am.

10    Q.   So are you implying that grooming is without any

11   dissenters?

12    A.   I believe my response to that question was "of the

13   research that I'm familiar with."  I'm not aware of research

14   that says that grooming doesn't exist.

15    Q.   You're aware, though, of research that comes up with

16   issues with grooming, correct?

17    A.   I'm aware of some of the differences between different

18   academics and different research, yes, ma'am.

19    Q.   And they have issues with the ability to measure

20   grooming and the ability to even identify what grooming is,

21   correct?

22    A.   My understanding is that there are differences in

23   different definitions, that different academics may use

24   different definitions, may use different terminology, may

25   focus on different aspects.  So that can make it difficult,

1    maybe from an academic standpoint, of being able to test.

2    So, yes, I'm aware of certain differences between different

3    researchers.

4    Q.    And your specific definition was given to you by the

5    FBI, correct?

6    A.    It was developed by the Behavioral Analysis Units,

7    yes, ma'am.

8    Q.    BAU, the unit in which you work for, correct?

9    A.    Yes, ma'am.

10   Q.    And that's where the definition that you're basing

11   your testimony on what grooming is came from, correct?

12   A.    In addition to my experience and other training, yes,

13   ma'am.

14   Q.    Well, when you gave a definition yesterday, it was the

15   definition given to you by the Behavioral Analysis Unit --

16   A.    Yes, ma'am.

17   Q.    -- correct?  And the wheel that we looked at with all

18   the five stages and the interlocking circles that we looked

19   at, that you created, those were all things given to you in

20   your training, in your capacity as an FBI agent, correct?

21   A.    Again, the language used there and the stages was

22   developed as overarching framework to help describe what we

23   see in our experience.  But, yes, that was created by the

24   BAU.

25   Q.    So the five stages that we witnessed and the three

1    interlocking circles were things that you learned through

2    your training as an FBI agent, correct?

3    A.   Training and experience, yes, ma'am.

4    Q.   You stated that you work in chat rooms with known

5    predators, correct?

6    A.   I have in the past, yes.

7    Q.   You stated that you assume the identities of convicted

8    child molesters, correct?

9    A.   Either convicted or arrested.  I've done that in the

10   past, yes, ma'am.

11   Q.   And the ones who were arrested, do you ever go back

12   and follow up to see if there was any false allegations or

13   any acquittal ratings on those?

14   A.   Generally speaking, I'll stay involved in those cases

15   through at least the trial stage or conviction stage.

16   Q.   So what percentage of the cases that you have worked

17   have ended in no grooming?

18   A.   I have no way of answering that question.  Over

19   13 years and hundreds of cases, I don't know the answer to

20   that.

21   Q.   50 percent?  Would you say, in half of your cases,

22   you'd find that there's no grooming?

23   A.   Again, I think it would depend on the type of case.

24   So not every offender engages in grooming behaviors.  And

25   so, again, it's very difficult for me to put any kind of

1    percentage on that.

2    Q.    Would you agree with me that a vast majority of your

3    cases end with the conclusion that there was grooming?

4    A.    Again, I don't know because I'm involved in many other

5    cases that may involve child sexual abuse that don't involve

6    grooming.

7    Q.    You spoke with the prosecutor just moments ago, or

8    yesterday, frankly, and you stated that the things that

9    you're telling me about grooming are common, correct?

10   A.    Common to those offenders who utilize the grooming

11   process, not common to every single offender.

12   Q.    And that's based off of the hundreds of cases you've

13   worked on, correct?

14   A.    Yeah.  Based on the totality of my training and

15   experience, yes.

16   Q.    And the thousands of offenders you've interacted with,

17   correct?

18   A.    Interacted with or familiar with or was involved in

19   those investigations.

20   Q.    And the behavior you defined as grooming, such as

21   high-fiving and hugging too long, is from your experience

22   with those offenders and cases, correct?

23   A.    Again, a combination of experience and training, yes,

24   ma'am.

25   Q.    But you don't know how many of those offenders and

1    cases that you worked on were actually grooming?

2    A.   Again, ma'am, over 13 years and hundreds of cases and

3    thousands of offenders, I don't have any way to put a

4    percentage on that.

5    Q.   But you absolutely know that those characteristics are

6    common?

7    A.   In my training and experience, those are common

8    characteristics to offenders that utilize the grooming

9    process.

10   Q.   So you've met at least three offenders who have used

11   that?

12   A.   Yes, ma'am.

13   Q.   Hundreds of offenders who have used that?

14   A.   I would say that I'm familiar with hundreds of

15   offenders who have utilized that process.

16   Q.   Okay.  How many are you familiar with that were not

17   offenders?

18   A.   Can you clarify?

19   Q.   Sure.  How many times have you found grooming, but

20   there was actually no molestation?

21   A.   Again, are you talking about physical sexual abuse or

22   online sexual abuse?

23   Q.   Either.

24   A.   Again, I'm not -- I just don't have any way of

25   answering that question.  I don't have a statistical

1    analysis or a breakdown of my cases.

2    Q.    You've testified in trials before, correct?

3    A.    Yes, ma'am.

4    Q.    Let me ask you different.

5          Have you ever testified in a child custody case?

6    A.    No, ma'am.

7    Q.    Have you ever testified in a case that isn't criminal?

8    A.    No, ma'am.

9    Q.    Have you ever been consulted on a case where a custody

10   battle is in the works?

11   A.    I believe I've been involved in cases where custody

12   was a part of that process.

13   Q.    And a criminal case was part of that process, correct?

14   A.    I believe the case was referred to us for whatever

15   criminal aspect that they were looking at and potentially

16   included some type of custody dispute.

17   Q.    Have you ever -- you've never been called as a civil

18   witness, have you?

19   A.    No, ma'am.

20   Q.    In these criminal cases, you find out there's

21   grooming, and then you go to look to see what the common

22   behaviors are, correct?

23   A.    I don't know if I would categorize it quite that way.

24   In my role at BAU now, if we were referred a case, we'd

25   review the totality of whatever materials that we have

1    access to.

2    Q.    And it's the totalities of those materials that make

3    you an expert to say this was grooming, correct?

4    A.    Again, I would just say that these are common clusters

5    of behaviors that I'm familiar with over the course of my

6    career.

7    Q.    And those same common clusters of behaviors could be

8    perfectly innocent, correct?

9    A.    It would depend, again, on the context.  As I

10   testified to, simply providing the child with a gift or

11   saying they look nice, in isolation, may not have anything

12   to do with the grooming process.

13   Q.    So let's talk about when we get to grooming.  I'm an

14   aunt.  I have a niece.  She's 12 -- 13.  Forgive me.  She

15   has -- she comes to my house.  We go shopping together.  I

16   teach her mock trials on Mondays.  We spend the night

17   together.  I take her to dance.  I take her shopping.  She

18   goes swimming in my pool.

19          Have I groomed my niece?

20   A.    Again, based on what you're specifically stating

21   there, that may not have anything at all to do with

22   grooming.  As I testified earlier, there are many people who

23   have access to children who don't groom them for sexual

24   purposes.

25   Q.    Okay.  What if she tells me things she doesn't tell

1   her mom, because she's 13 and she's worried that her mom is

2   going to be mad at her?  Have I groomed my niece?

3   A.   Again, taken in isolation, it would be a difficult --

4   with just that, alone, for me to say that that is grooming.

5   I would have probably other questions to ask, but that may

6   not have anything at all to do with the grooming process.

7   Q.   She's 13, has self-esteem issues.  I tell her she's

8   beautiful, she's lucky, she's a smart girl, and she's going

9   to do amazing things.

10          Have I groomed my niece?

11  A.   No.  Again, I would say that the context is important.

12  I would have many other questions before I would ever state

13  that something hypothetical that you're asking would be

14  grooming.

15  Q.   And if she had access to her mother, access to her

16  father, a grandparent, grandmother, grandfather, cousins

17  that she's friends with and close with, have I groomed my

18  niece?  Is she a vulnerable subject now, ready for

19  isolation?

20  A.   I don't know that I could answer that question, just

21  based off the information that you're giving me.  It's

22  possible that she would have vulnerabilities that other kids

23  may have, too.  I wouldn't be able to answer that just based

24  off of your question.

25  Q.   Her mom is not a fan of TikTok and Snapchat.  To be

1    frank, my IT husband is not a fan of TikTok either.  But

2    when she's at my house, I let her use Snapchat and TikTok.

3    Have I groomed my niece?

4    A.    Again, based in isolation, I would have to ask many

5    other questions and learn the totality of context before

6    that would be considered grooming behaviors.

7    Q.    Let me ask you this:  What if I was her uncle?

8    A.    I would have the same response.

9    Q.    So you would agree with me that the gender doesn't

10   matter?

11   A.    I mean, gender could matter but, based on what you're

12   telling me, I would have the same response.

13   Q.    There was a lot of "absolutely's" when you were on

14   direct.  And a lot of "depends" now that you're speaking to

15   me.  Is there a reason why I don't get "absolutely's"?

16   A.    I don't believe I said many "absolutely's."  I may

17   have said that once or twice.

18   Q.    Those three interlocking circles, remember?  We have

19   "vulnerability" -- "accessibility"?

20   A.    "Availability."

21   Q.    "Availability."  I got my wrong "ability" there.  And

22   then you have "desirability," right?

23   A.    Yes, ma'am.

24   Q.    And you interlock them because they have to go

25   together, right?

1    A.   They're all interconnected, yes, ma'am.

2    Q.   And the reason why you can't tell me if I've groomed

3    my niece is because you don't know if I like 12-year-old

4    girls?

5    A.   Not necessarily.  Again, as I described it, it depends

6    on the totality of the circumstances.  So additional

7    questions that I would ask would be:  Is there an escalation

8    in those behaviors?  Is there a persistence in encouraging

9    the child to talk about sexual issues?  Is there a

10   development of a romantic relationship where there's

11   romantic communications going back and forth?  Is there,

12   again, a persistence and frequency and intensity of these

13   communications going all through the child's life?  Are

14   there attempts to isolate the child from other people?  Are

15   there sexual demands being made in the context of a loving

16   relationship?  Is there aspects of encouraging the child not

17   to tell anybody about this?

18        So that's just some examples of additional

19   questions that I would ask.

20   Q.   So when you told the Government that it's important to

21   know the desirability, what the person is attracted to,

22   you're now saying that that matters less?

23   A.   No, ma'am, not at all.  What I testified to was that

24   all three of those variables are interconnected and related

25   to the sexual abuse of children.  What I testified to

1    yesterday was that sometimes we will see that availability

2    and vulnerability may take on a little bit extra weight,

3    depending on what type of access and what type of

4    vulnerabilities a child may have.  That doesn't mean that

5    the desirability is not a part of that.

6    Q.   So you would agree with me then that it is difficult

7    to just have a set of facts and just look at it and say this

8    is grooming in a vacuum, correct?

9    A.   I would say, the more information that we have, the

10    more helpful it is for us to review that.

11    Q.   And it's your thousands of interactions with

12    offenders -- but you don't know how many of them were

13    offenders -- or in your hundreds of cases -- but you don't

14    know how many were false allegations -- and that's what

15    makes you eligible to look at the entire situation and say,

16    "This is grooming for the purposes of a sexual act,"

17    correct?

18        MS. ONG:  Objection, Your Honor.  I think she's

19    mischaracterizing the witness' testimony.  And that's also

20    an extremely compound question.

21        THE COURT:  Yes.  Sustained.

22    Q.   (BY MS. BOOTH):  Let me break it down.

23        The reason you are an expert in grooming is

24    because of your experience, correct?

25    A.   Based on my training and experience in 13 years of

1   being involved in crimes against children, my testimony is

2   that these are common clusters of behaviors that I've been

3   familiar with that are used by those offenders that would

4   engage in the grooming process.

5   Q.   And it's that unique and grand experience that makes

6   you the expert that sits on the stand to testify to this,

7   correct?

8   A.   I...that's a difficult question for me to answer.  I

9   was asked to come testify to my experience and I was

10   qualified as an expert in court.  So if that answers your

11   question, that's -- yes, in terms of me being qualified as

12   an expert, I believe that I was qualified by the Court.

13   Q.   And you were flown in to give this testimony, correct?

14   A.   I flew in and the Government paid for my flight as a

15   Government employee.

16   Q.   And it's your position that all of the things I told

17   you about, who I am and my relationship with my niece, you,

18   as an expert, would still need more in order to peg that as

19   grooming, correct?

20   A.   Again, the more information that we have in any case,

21   the more helpful it is for us.

22   Q.   Because it's difficult to look at a set of facts --

23   maybe three things happened.  Is that grooming?  Can you

24   make that determination?  I met three of these five

25   criteria:  "Grooming."

1    A.   I wouldn't say that there's any set number of

2    behaviors or some type of checklist we would have to mark

3    off for us to do that.  Again, it would be the totality of

4    the circumstances and the context of these circumstances.

5    Q.   Sure.  And it's those totality of the circumstances

6    that you have to look at as an agent to then make a specific

7    finding, "In my expert opinion, this would be grooming,"

8    correct?

9    A.   We may provide an opinion on that, yes, ma'am.

10   Q.   Your expert opinion?

11   A.   Yes, ma'am.

12   Q.   You are what's called a "blind witness."  That's what

13   you told the Government, correct?

14   A.   Yes, ma'am.

15   Q.   And you know nothing about this case?

16   A.   No, ma'am.

17   Q.   So you don't have an opinion on whether or not my

18   client engaged in grooming?

19   A.   No, ma'am.

20   Q.   Let me ask this question maybe better.

21        Can you name to me a false allegation

22   investigation you were involved in?

23   A.   Can you clarify "false allegation"?

24   Q.   Sure.  An allegation that was proven to be not true.

25   A.   We have -- it's a confusing question only because we

1   have cases that we refer to as "false allegations" that

2   typically involve reports of missing children.  So I've been

3   involved in numerous cases where someone will make a claim

4   that their child's missing or abducted --

5   Q.   Let me go ahead and stop you there.  You're here as a

6   grooming expert, correct?

7   A.   Yes, ma'am.

8   Q.   Let's stick with grooming.  Why don't you tell me one

9   case where you've had that was a false allegation or an

10  allegation that was proven to be not true.

11  A.   I don't know if I can think of one off the top of my

12  head.

13              MS. BOOTH:  May I have a moment, Your Honor?

14              THE COURT:  Sure.

15                  (Discussion off the record.)

16              MS. BOOTH:  No further questions.  I pass the

17  witness.

18              THE COURT:  Redirect?

19              MS. ONG:  Yes, Your Honor.

20                     **REDIRECT EXAMINATION**

21  Q.   (BY MS. ONG):  Special Agent O'Donnell, on

22  cross-examination, Ms. Booth was asking about the

23  definition of grooming that you testified to.  So,

24  just to be clear, the stages and components that you

25  testified to the jury regarding grooming, how did

1    FBI come up with those stages and components?

2    A.   So that was based on decades worth of investigative

3    experience, not just at BAU, but with -- from other FBI

4    agents, and other state, local, and other agencies that have

5    investigated these cases for years.

6    Q.   And the FBI, when they work on child exploitation

7    cases, are you [sic] working on those in isolation?  Do you

8    also work with state and local law enforcement individuals?

9    A.   Oftentimes, it's common for us to work with other

10   agencies, including state and local.

11   Q.   And for federal child exploitation crimes, who is the

12   primary investigative agency who investigates those types of

13   crimes?

14   A.   My understanding is the FBI.

15   Q.   On cross-examination, Ms. Booth asked you if you had

16   ever testified as a civil witness.  Do you remember that?

17   A.   Yes, ma'am.

18   Q.   I know you don't know about the facts of the case, but

19   are we here today in a criminal case or civil case?

20   A.   A criminal case, is my understanding.

21   Q.   Ms. Booth also accused you of not giving, I think she

22   said, absolute answers to her questions.  Just to be clear,

23   when I was asking you questions on direct, did my questions

24   involve complex hypothetical situations?

25   A.   No, ma'am, not that I remember.

1    Q.    Is it more difficult to answer those types of

2    questions with absolute certainty if you don't have all the

3    facts?

4    A.    Yes, ma'am.

5    Q.    Special Agent O'Donnell, again, the definition and the

6    stages of grooming that you've talked about and testified to

7    this jury, are you saying that every single thing that you

8    talked about needs to be present in order for grooming to

9    occur?

10   A.    Not necessarily, no, ma'am.

11   Q.    And one other thing that Ms. Booth touched on in her

12   cross was trying to pin down when grooming happens, when

13   grooming doesn't happen.  Can you give the ladies and

14   gentlemen of the jury examples of child sex abuse cases that

15   you've worked on where there is no grooming?

16   A.    Yes, ma'am.  There can be a variety of cases in which

17   grooming is not involved.  So sexual abuse that is primarily

18   or in totality done through physical force would not be

19   considered grooming.  Child sexual abuse cases that are

20   primarily through intimidation or threats would not be

21   grooming.  Situations where an offender may abuse a child

22   while they are, say, asleep or otherwise incapacitated,

23   again, in isolation, would not necessarily be grooming.

24   Situations where an offender may access a child's online

25   accounts without the child's knowledge and then use that to

41

1    extort the child to provide more child sexual abuse material

2    also would not be grooming.

3              MS. ONG:  Thank you, Special Agent O'Donnell.

4              THE COURT:  Thank you for your testimony.  You

5    can step down.

6              THE WITNESS:  Thank you, Your Honor.

7                     (End partial transcript.)

8                     * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  UNITED STATES OF AMERICA

 2                  DISTRICT OF NEW MEXICO

 3

 4            CERTIFICATE OF OFFICIAL REPORTER

 5      I, Vanessa I. Alyce Chavez, CRR, RPR, NMCCR, and

 6  Federal Official Court Reporter in and for the United States

 7  District Court for the District of New Mexico, do hereby

 8  certify that pursuant to Section 753, Title 28, United

 9  States Code, that I did report in stenographic shorthand to

10  the best of my skill and ability the foregoing pages 1-41 of

11  Part 2 of 2 of the proceedings set forth herein, that the

12  foregoing is a true and correct transcript of the

13  stenographically recorded proceedings held in the

14  above-entitled matter and that the transcript page format is

15  in conformance with the regulations of the Judicial

16  Conference of the United States.

17

18  Dated this 4th day of August 2023.

19

20  S/Electronically Filed
    Vanessa I. Alyce Chavez, CRR, RPR, NMCCR
21  Federal Official Court Reporter
    100 N. Church Street
22  Las Cruces, NM 88001
    Phone: (575) 528-1430
23  Email:  Vanessa_Alyce@nmd.uscourts.gov

24

25
```